## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ANTHONY MICHAEL PATTERSON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 13-cv-0085 (KBJ) |
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

Plaintiff Anthony Michael Patterson ("Patterson" or "Plaintiff") filed the instant complaint alleging that his constitutional rights were violated when he was arrested for using profanity in a public park. He has brought suit against United States Park Police Sergeant Todd Reid and Officers Jennifer Lemke and Matthew Cooney (collectively, "individual defendants," "Defendants," or "the officers"), claiming that they violated his First and Fourth Amendment rights and requesting damages under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). (Compl., ECF No. 1, ¶¶ 21-26.) Patterson has also brought a false arrest claim against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). (*Id.* ¶¶ 27-29.)

Presently before the Court is the individual defendants' motion to dismiss the claims against them. (Defs.' Mot. to Dismiss the Compl. ("Defs.' Mot."), ECF No. 8.) In that motion, the individual defendants argue that the first two counts of the complaint—the *Bivens* claims against the officers—must be dismissed for failure to

state a claim upon which relief can be granted because the officers are entitled to qualified immunity.

Upon consideration of the arguments made in the parties' briefs and at the October 31, 2013, motion hearing, the Court **DENIES** the individual defendants' motion to dismiss. A separate order consistent with this opinion will follow.

## I.    BACKGROUND

### A.  Facts Alleged in the Complaint

Patterson's complaint alleges the following facts. Patterson is an Occupy D.C. protestor who was in McPherson Square park on January 8, 2012, when he saw three teenagers enter the park with signs supporting the Tea Party movement. (Compl. ¶ 8.) The complaint states that Patterson looked up at the sky when he saw the Tea Party supporters and said, "Ah, this fucking bullshit." (*Id.* ¶ 9.) According to Patterson, this statement was "not directed at anyone in particular," and was made at a "normal conversational volume" in a non-aggressive manner that "merely indicated annoyance." (*Id.*) Patterson alleges that the Tea Party supporters were approximately seven feet away from him when he made the comment and did not acknowledge Patterson or his comment in any way. (*Id.*) The complaint states that the only people present in the park when Patterson made the statement, other than he and the three Tea Party supporters, were two other Occupy D.C. protesters and eight police officers. (*Id.* ¶ 8.)

Seconds after Patterson made the statement, several United States Park Police officers, including Sergeant Reid and Officers Lemke and Cooney, approached him. (*Id.* ¶ 10.) According to the complaint, Sergeant Reid told Patterson not to use profanity, and it was only after Sergeant Reid issued that rebuke that the Tea Party

supporters appeared to notice Patterson.  (*Id.*)  In response to Sergeant Reid, Patterson turned towards the officers and said, "I can't say fuck?"  (*Id.* ¶ 11.)  Sergeant Reid told Patterson that this was his "second warning."  (*Id.* ¶ 12.)  Patterson replied, "That's fucking bullshit."  (*Id.* ¶ 13.)  Sergeant Reid then ordered Officers Lemke and Cooney to arrest Patterson for disorderly conduct, which they did.  (*Id.* ¶¶ 14-15.)  The complaint does not allege that the Tea Party supporters had any particular reaction to the conversation between Patterson and the officers.  (*See id.* ¶¶ 11-15.)

The officers brought Patterson to their station, processed him, and released him with an upcoming D.C. Superior Court date.  (*Id.* ¶ 16.)  Patterson alleges that as he left the station, Sergeant Reid said to him, "Mr. Patterson, you are right.  Profanity is protected under freedom of speech.  But when you use profanity it causes a hostile environment for the police."  (*Id.* ¶ 17.)

On January 10, 2012, Officer Lemke appeared before an Assistant Attorney General for the District of Columbia and signed a *Gerstein* affidavit regarding Patterson's arrest (*id.* ¶ 19), which is discussed further below.[1]  In the complaint, Patterson references this affidavit solely to allege that, "[t]he *Gerstein* affidavit signed by Officer Lemke contained statements that Officer Lemke knew to be false."  (*Id.* ¶ 19.)  One month later, the government dropped the disorderly conduct charges against Mr. Patterson.  (*Id.* ¶ 20.)

---

[1] A *Gerstein* affidavit is an arresting officer's sworn statement that probable cause exists to believe that a crime was committed and that the person identified in the statement is the one who committed it.  *See Gerstein v. Pugh*, 420 U.S. 103, 120 (1975).

## B. Procedural History

Almost one year after his arrest, Patterson filed the instant complaint, which includes three counts: two against the arresting officers in their individual capacities, and one against the United States. The third count alleges that the United States is liable under the Federal Tort Claims Act for Patterson's false arrest (Compl. ¶¶ 27-29); this count is not at issue in the instant motion.[2] Instead, the instant motion to dismiss addresses the first two counts of the complaint—the claims against the individual defendants. Count I alleges that Sergeant Reid violated Patterson's First Amendment rights when he ordered Officers Lemke and Cooney to arrest Patterson solely based on the content of protected speech in the absence of probable cause to arrest him for disorderly conduct and that Officers Lemke and Cooney violated Patterson's First Amendment rights when they complied with that order and actually arrested him. (*Id.* ¶¶ 22-23.) In Count II, Patterson similarly alleges that the officers also violated his Fourth Amendment rights insofar as there was no probable cause for the arrest. (*Id.* ¶¶ 25-26.)

The individual defendants seek dismissal of these two counts for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (Defs.' Mot. at 1.) With respect to Count I, the First Amendment retaliatory arrest claim, the individual defendants contend that there is no *Bivens* remedy available for a First Amendment violation, and even if there is such a remedy, the officers are

---

[2] The United States filed an answer to this count, in which it asserted several affirmative defenses, including: (1) failure to state a claim upon which relief may be granted; (2) no acts or omissions by the government were the proximate cause of any injury; (3) the constitutional claims are barred by qualified immunity; (4) Patterson failed to mitigate his damages; and (5) the United States, through its employees and agents, acted with due care and diligence at all relevant times. (U.S. Answer, ECF No. 7, at 1-2).

entitled to qualified immunity because they had probable cause for Patterson's arrest. (*See* Defs.' Mot. at 1, 4-5.)  Defendants seek dismissal of Count II, the Fourth Amendment false arrest claim, solely on the grounds that the officers are entitled to qualified immunity.  (*See* Defs.' Mot. at 1, 5-6.)

The individual defendants have attached to their motion a copy of the *Gerstein* affidavit that Officer Lemke executed in connection with Patterson's arrest.  In the *Gerstein* affidavit, Officer Lemke contends that Patterson yelled "fuck white people" when he saw the Tea Party protesters enter the park, and she describes how Patterson continued to yell "fuck" multiple times after Sergeant Reid approached him and warned him to stop cursing.  (Gerstein Aff., Ex. 1 to Defs.' Mot., ECF No. 8-1.)  According to Officer Lemke, Patterson responded to Sergeant Reid by stating that his "language was protected under [the] 1st amendment."  (*Id.*)  The affidavit also represents that Patterson's language caused "a crowd of onlookers" to gather in the square.  Officer Lemke avers that Patterson repeatedly shouted profanity until he was taken away, and that Sergeant Reid specifically warned him against "this type of language, intending to cause a disturbance."  (*Id.*)  The individual defendants contend that the *Gerstein* Affidavit further supports that the officers had probable cause for Patterson's arrest. (Reply In Support of Defs.' Mot. to Dismiss ("Defs.' Reply"), ECF No. 14, at 2 n.1.)

Conversely, Patterson maintains that both of the challenged counts of his complaint survive the individual defendants' motion to dismiss because he was arrested for engaging in protected speech and without probable cause to believe he was committing any crime.  (Mem. of P & A in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Mem."), ECF No. 11, at 5.)  As for Count I, Patterson maintains that the First

Amendment is violated when a person is arrested for protected speech, including profanity that does not threaten violence (*id.* at 7-8), and counsel for the plaintiff argued at the motion hearing that the Court must follow D.C. Circuit case law recognizing the availability of a *Bivens* remedy for such a violation. Moreover, with respect to both counts of the complaint, Patterson urges that no reasonable officer would have found probable cause for his arrest; and, therefore, the officers are not entitled to qualified immunity. (*Id.* at 4-5.)

## II.      STANDARD OF REVIEW

### A. Motion To Dismiss

The individual defendants seek dismissal of Patterson's claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). (Defs.' Mot. at 1.) In evaluating a motion to dismiss, the court must accept as true all factual allegations in the complaint, and the plaintiff should receive the benefit of all inferences that can be derived from the facts alleged. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). "While the complaint is to be construed liberally in plaintiff's favor, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint; nor must the Court accept plaintiff's legal conclusions." *Kramer v. United States*, 460 F. Supp. 2d 108, 110 (D.D.C. 2006) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a plaintiff must plead enough facts to make the claim seem plausible on its face. *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). Although a plaintiff may still survive a Rule 12(b)(6) motion even where "recovery is very remote and unlikely[,]" the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555-56 (internal quotation marks and citation omitted).

When evaluating a motion to dismiss under Rule 12(b)(6), a court generally does not consider matters beyond the pleadings. *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119-20 (D.D.C. 2011). However, the court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss[.]" *Id.* at 119 (internal quotation marks and citations omitted); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) (same). For example, a plaintiff's complaint "necessarily relies" on a document when the complaint "quote[s] from and discuss[es a document] extensively." *W. Wood Preservers Inst. v. McHugh*, 292 F.R.D. 145, 149 (D.D.C. 2013) (citation omitted). Even if a court considers a document attached to a motion to dismiss, the court must still construe all well-pleaded factual allegations in the plaintiff's favor, especially if the parties disagree about the nature of the evidence. *See, e.g.*, *Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186-87 (D.D.C. 2001) (considering tariff rates submitted with defendant's motion to dismiss, but accepting plaintiff's allegation that those rates were not the ones plaintiff had agreed to).

**B. Possible Conversion To A Motion For Summary Judgment**

If the Court considers materials outside the pleadings on which the complaint does not necessarily rely, it must convert the motion to dismiss into one for summary judgment. *Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011) (citing Fed. R. Civ. P. 12(d)); *see also Wiley v. Glassman*, 511 F.3d 151, 160 (D.C. Cir. 2007) (same).[3] "The decision to convert a motion to dismiss into a motion for summary judgment . . . is committed to the sound discretion of the trial court." *Flynn v. Tiede-Zoeller, Inc.*, 412 F. Supp. 2d 46, 50 (D.D.C. 2006) (citation omitted); *see also Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484, 493 (D.C. Cir. 1996) (Silberman, J., concurring in part and dissenting in part) ("[T]he judge's discretion on a Fed. R. Civ. P. 12(b)(6) motion to dismiss extends only to whether to accept evidentiary or factual submissions that would convert the motion into one for summary judgment under Rule 56."). In exercising this discretion, the "reviewing court must assure itself that summary judgment treatment would be fair to both parties[.]" *Tele-Commc'ns of Key West, Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985). For example, "[i]n converting the motion, district courts must provide the parties with notice and an opportunity to present evidence in support of their respective positions." *Kim*, 632 F.3d at 719 (citation omitted). Alternatively, "if the parties have not been provided with notice or an opportunity for discovery[,]" the Court must ensure that the parties "have had a reasonable opportunity

---

[3] Specifically, Rule 12(d), entitled "Result of Presenting Matters Outside the Pleadings," states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

to contest the matters outside of the pleadings such that they are not taken by surprise." *Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 86 (D.D.C. 2012) (citation omitted).

In this case, Defendants attached Officer Lemke's sworn *Gerstein* affidavit to their motion to dismiss. (*See* Gerstein Aff.) Initially, Defendants attached the "criminal incident reports" associated with Patterson's arrest, but the Court granted leave to substitute the *Gerstein* affidavit. (Minute Order of July 16, 2013.) In that order, the Court preliminarily concluded that the affidavit was both referenced in and central to Patterson's complaint, but the Court now recognizes that, while the complaint references the *Gerstein* affidavit, it does so only to deny its validity. (*See* Compl. ¶ 19 ("The *Gerstein* affidavit signed by Officer Lemke contained statements that Officer Lemke knew to be false, including that Mr. Patterson yelled, 'Fuck white people.' At no point did Mr. Patterson yell or otherwise say, 'Fuck white people' or words to that effect.").) Accordingly, although the *Gerstein* affidavit is referenced in the complaint and contains factual material at the heart of the dispute, the Court finds that the complaint does not necessarily *rely* on the *Gerstein* affidavit: Patterson does not discuss it extensively and minimally quotes from it only to impugn Officer Lemke's description of events. Moreover, at the hearing, counsel for the defendants indicated that Defendants did not want their motion converted into one for summary judgment based on the Court's consideration of the *Gerstein* affidavit, and suggested that the Court consider only the facts alleged in the complaint. Accordingly, the Court declines to consider the *Gerstein* affidavit and will decide the instant motion solely on the facts alleged in the complaint. *See Ward*, 768 F. Supp. 2d at 119-20; *Vanover*, 77 F. Supp.

2d at 98; *see also Lipton*, 135 F. Supp. 2d at 186-87 (considering the outside materials only to the extent that they did not contradict with the facts alleged in the complaint).

## III.    ANALYSIS

In their motion, the individual defendants raise two distinct challenges to Patterson's claims.  First, they contend that Patterson cannot bring an action under *Bivens* for a First Amendment violation, as alleged in Count I.  (Defs.' Mot. at 4-5.) Second, Defendants maintain that even if the Court were to recognize such a claim, both the First and Fourth Amendment claims (Counts I and II) must be dismissed for failure to state a claim because they cannot withstand the defense of qualified immunity.  (*Id.* at 5-8.)  In regard to the qualified immunity defense, the officers specifically contend that they did not violate Patterson's constitutional rights because the arrest itself was lawful, as any reasonable police officer would have found probable cause to arrest Patterson for disorderly conduct under the circumstances alleged in the complaint.  (Defs.' Mot. at 8.)  For his part, Patterson contends that a First Amendment *Bivens* claim is actionable in the D.C. Circuit, and that the officers are not entitled to qualified immunity because no reasonable police officer faced with the alleged facts would have found probable cause for his arrest.  (*See* Pl.'s Mem. at 1.)  For the reasons that follow, this Court concludes that both counts survive the officers' motion to dismiss.

### A.  A *Bivens* Remedy Is Available For Plaintiff's First Amendment Claims

As noted, Patterson's complaint alleges violations of the First and Fourth Amendment.  Defendants concede that Patterson's Fourth Amendment claim is actionable, since *Bivens* itself involved a Fourth Amendment violation.  *Bivens v. Six*

*Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); *see also Minneci v. Pollard*, 132 S. Ct. 617, 621 (2012) ("In *Bivens* itself the Court held that the Fourth Amendment implicitly authorized a court to order federal agents to pay damages to a person injured by the agents' violation of the Amendment's constitutional strictures." (citing *Bivens*, 403 U.S. at 389)). But in their briefing and at the hearing, Defendants took the bright-line position that no *Bivens* action exists for a First Amendment violation because the Supreme Court has not expressly extended *Bivens* to First Amendment claims (Defs.' Mot. at 4-5), and it has never held that there is a First Amendment right to be free from retaliatory arrest when there is probable cause for the arrest (*id.* at 6-8 (relying on *Reichle v. Howards*, 132 S. Ct. 2088, 2093 n.4, 2094 (2012))). Defendants' First Amendment arguments miss the mark for two primary reasons: first, while it is true that the Supreme Court has not explicitly authorized a First Amendment *Bivens* action, the D.C. Circuit has, *see Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1981); and second, even if there is no First Amendment right to be free from retaliatory arrest in the *presence* of probable cause, it is well established that where, as here, there is an allegation of retaliatory arrest in the *absence* of probable cause, the plaintiff has a viable First Amendment claim.

The requirements and jurisprudence of the *Bivens* remedy make clear why Defendants' arguments fail. *Bivens* is a judicially created doctrine that allows a plaintiff to bring a cause of action for money damages against agents acting under the color of federal authority who cause injury by violating the plaintiff's constitutional rights. *See generally Bivens*, 403 U.S. at 389.[4] To state a prima facie *Bivens* claim, the plaintiff must establish that: (1) the defendant violated a federal constitutional right of

---

[4] In essence, *Bivens* is the federal-actor analog to § 1983 actions.

the plaintiff, *Lewis v. Bayh*, 577 F. Supp. 2d 47, 57 (D.D.C. 2008); (2) the right was

clearly established, *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 689 (D.C. Cir.

2009); (3) the defendant was a federal actor by virtue of acting under color of federal

law, *CHS Indus., LLC v. U.S. Customs & Border Prot.*, 653 F. Supp. 2d 50, 55 (D.D.C.

2009); and (4) the defendant was personally involved in the alleged violation, *Garcia v.*

*Sebelius*, 867 F. Supp. 2d 125, 137 (D.D.C. 2012), *vacated in part on other grounds by*

919 F. Supp. 2d 43 (2013).  Moreover, in any action claiming retaliation—like the

alleged retaliatory arrest at issue here—a *Bivens* plaintiff must show a causal

connection between a defendant's retaliatory animus and the plaintiff's subsequent

injury.  *Hartman v. Moore*, 547 U.S. 250, 259 (2006).

Significantly, *Bivens* itself involved a Fourth Amendment violation, *Bivens*, 403

U.S. at 395-96, and the *Bivens* remedy is not necessarily available for all types of

constitutional infractions; indeed, "[b]ecause implied causes of action are disfavored,

the [Supreme] Court has been reluctant to extend *Bivens* liability 'to any new

context[.]'" *Iqbal*, 556 U.S. at 670.[5]  Nevertheless, to date, the *Bivens* doctrine has

been extended to recognize an implied cause of action for the violation of several

constitutional amendments, including the Fifth, Eighth, Ninth, Fourteenth, and—

contrary to Defendants' staunch assertion—the First.  *See* Rodney A. Smolla, 2 Fed.

Civil Rights Act, § 14:155 at 850 (3d ed. 2013) (collecting cases).

---

[5] Whether liability is extended depends, in large part, on whether there is congressional intent to displace a *Bivens* remedy (either through an alternative scheme for relief that makes a *Bivens* action is unnecessary, or otherwise), *see Bush v. Lucas*, 462 U.S. 367, 378 (1983), and/or whether the matter is of a "special nature" such that a *Bivens* remedy would be inappropriate, *see Chappell v. Wallace*, 462 U.S. 296 (1983); *Vance v. Rumsfeld*, 701 F.3d 193 (7th Cir. 2012) (en banc), *cert. denied*, 133 S. Ct. 2796.

With respect to alleged First Amendment violations, *Bivens* actions have been extended only to certain violations of free speech. For example, courts have recognized *Bivens* First Amendment actions based on retaliatory termination of federal employees, *see Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 66 (D.D.C. 2009), *aff'd sub nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011), and retaliatory prosecution (*i.e.*, malicious prosecution based solely on protected speech in the absence of probable cause), *Hartman*, 547 U.S. at 250. Most importantly for the case at bar (and fatal to the individual defendants' argument that Patterson's First Amendment *Bivens* claim is not cognizable), the D.C. Circuit has also extended *Bivens* to recognize First Amendment retaliatory arrest claims. *See Dellums*, 566 F.2d at 196 (holding that plaintiffs can bring a *Bivens* action under the First Amendment); *see also Bloem v. Unknown Dep't of the Interior Employees*, 920 F. Supp. 2d 154, 161 (D.D.C. 2013) (finding that the plaintiff stated a *Bivens* claim for a First Amendment violation for retaliatory arrest); *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 52 (D.D.C. 2013) (finding that the plaintiff demonstrator stated a *Bivens* claim for a First Amendment violation for retaliatory arrest).

In *Dellums*, the D.C. Circuit held that a *Bivens* remedy was available to Vietnam war protestors who were arrested on the steps of the United States Capitol in violation of their First Amendment rights. 566 F.2d at 194-96. The specific question before the court was whether there was "a cause of action under *Bivens* for redress of First Amendment violations," and the Circuit answered in the affirmative. *Id.* at 194-95. In so holding, the D.C. Circuit "focused on the harm that would result from the loss of an ability to express oneself[.]" *Hartley*, 918 F. Supp. 2d at 50 (citing *Dellums*, 566 F.2d

at 195).  The *Dellums* court also "expressly rejected the appellants' argument that providing such a cause of action would set a trap for the unwary policeman by 'subject[ing] police officers to the alleged perplexities of First Amendment law,' noting that the 'broad good faith immunity' available to officers exempts them from being 'held to the standards of a constitutional lawyer.'"  *Bloem*, 920 F. Supp. 2d at 160 (alterations in original) (quoting *Dellums*, 566 F.2d at 195 n.84).

What is more, the D.C. Circuit is not alone among the courts of appeals in recognizing a *Bivens* claim premised on a First Amendment violation.  To the contrary, since *Dellums* was decided over three decades ago, other circuits have embraced its rationale.  *See, e.g.*, *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 14 F.3d 457, 464 (9th Cir. 1994) (finding that plaintiffs stated a *Bivens* claim by alleging that federal agents intended to interfere with the plaintiffs' speech about the environment); *Paton v. La Prade*, 524 F.2d 862, 870 (3d Cir. 1975) (recognizing a *Bivens* action for First Amendment violations).  And in their reasoning, these circuits have also highlighted the nonsensical result of allowing a cause of action against state officials for First Amendment violations under § 1983 but not against federal actors under *Bivens*.  *See* *Paton*, 524 F.2d at 870 ("There is no reason to allow federal officials to act with impunity in this context and to bar state officials.  The damage to the individual's first amendment interests is the same regardless of the perpetrator of the violation."); *see also Gibson v. United States*, 781 F.2d 1334, 1342 n.3 (9th Cir. 1986) ("Given the availability of § 1983 relief against state agents who infringe First Amendment rights, it is hard to see why *Bivens* relief should not be available to redress equivalent violations perpetrated by federal agents." (citation omitted)).

Defendants here question the continued viability of *Dellums* in light of the Supreme Court's recent decision in *Reichle*. In that case, the plaintiff brought a *Bivens* action claiming that Secret Service agents violated his First and Fourth Amendment rights when they arrested him at a public event where Vice President Richard Cheney was speaking, after the plaintiff orally criticized the Vice President and also laid a hand on the Vice President's shoulder. 132 S. Ct. at 2091-92. The Supreme Court found that the officer was entitled to qualified immunity on the plaintiff's First Amendment claim because the right to be free from retaliatory arrest *where there otherwise is probable cause* for the arrest was not clearly established in the Tenth Circuit. *Id.* at 2095-96. Here, Defendants rely principally on the Supreme Court's side comments that the Court has "never held that *Bivens* extends to First Amendment claims," (Defs.' Mot. at 4 (citing *Reichle*, 132 S. Ct. at 2093 n.4)), and "has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause." (Defs.' Mot. at 4 (citing *Reichle*, 132 S. Ct. at 2093).) But these comments from *Reichle* are pure *dicta*, and in any event, do not dispose of Patterson's First Amendment claim as Defendants maintain. *Reichle* involved a circumstance in which there *was* probable cause to arrest the plaintiff based on his conduct during the event in question; the Supreme Court simply did not consider any claim for retaliatory arrest in the *absence* of probable cause. *See* 132 S. Ct. at 2093. Moreover, the *Reichle* Court held only that a First Amendment right not to be subjected to retaliatory arrest when there is probable cause was not "clearly established" in the Tenth Circuit, *see id.*—*not* that no such right exists.

Most important, as described above, the D.C. Circuit has expressly recognized that there is a First Amendment right not to be arrested in retaliation for one's speech where there is otherwise no probable cause for the arrest, *see Dellums*, 566 F.2d at 195-96, and this Court cannot ignore the D.C. Circuit's binding precedent. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992) (en banc) (holding that decisions of the D.C. Circuit are binding "unless and until overturned by the court en banc or by Higher Authority" (citation omitted)); *Hartley*, 918 F. Supp. 2d at 52 ("Even if Defendants are correct in predicting the Supreme Court's response to questions not yet before it, this Court cannot accept its invitation to depart from this Circuit's binding precedent." (citations omitted)); *Owens-Ill., Inc. v. Aetna Cas. & Sur. Co.*, 597 F. Supp. 1515, 1520 (D.D.C. 1984) ("The doctrine of *stare decisis* compels district courts to adhere to a decision of the Court of Appeals of their Circuit until such time as the Court of Appeals or the Supreme Court of the United States sees fit to overrule the decision." (citations omitted)). Consequently, despite Defendant's arguments to the contrary, this Court concludes that Patterson's First Amendment *Bivens* claim—which alleges that Patterson was arrested without probable cause and "solely on account of the content of his speech" (Compl. ¶ 23)—is actionable.

### B. The Facts Alleged Do Not Establish That There Was Probable Cause To Arrest Plaintiff

The Court next turns to whether the complaint alleges facts that, if true, are sufficient to establish that there was no probable cause to arrest Patterson—an inquiry that strikes at the heart of Plaintiff's First and Fourth Amendment claims and also the

individual defendants' assertions of qualified immunity in this case. Defendants contend that, given the facts and circumstances alleged in the complaint, a reasonable officer would have concluded that there was probable cause to arrest Patterson for disorderly conduct and therefore the officers are entitled to qualified immunity. (Defs.' Mot. at 5-8.) Patterson denies that any reasonable officer could find probable cause for his arrest on the facts alleged, and urges the Court to reject Defendants' assertion of qualified immunity and, in turn, to deny their motion to dismiss. (Pl.'s Mem. at 4-7.) An analysis of the merits of Defendants' motion requires consideration of (1) the qualified immunity doctrine, (2) the law as it relates to an individual's constitutionally protected rights to speak and to not be arrested without probable cause, and (3) the facts and circumstances of the incident at issue here as alleged in the complaint.

### 1. The Qualified Immunity Doctrine

At the motion to dismiss stage, a plaintiff must allege sufficient facts to establish that the defendants are *not* entitled to qualified immunity. *See Bloem*, 920 F. Supp. 2d at 164. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Elkins v. District of Columbia*, 690 F.3d 554, 567 (D.C. Cir. 2012) (same). The defendant bears the burden of pleading and proving the defense of qualified immunity. *Harlow*, 457 U.S. at 815.

The two-part test set forth in *Saucier v. Katz*, 533 U.S. 194 (2001), as modified by *Pearson*, governs the qualified immunity analysis. In *Saucier*, the Supreme Court

directed lower courts to determine if "the facts that a plaintiff has alleged or shown make out a violation of a constitutional right" and also if "the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (internal citations omitted) (describing *Saucier*). "As laid out by the Supreme Court, the two pertinent questions in determining whether qualified immunity applies are (1) 'whether a constitutional right would have been violated on the facts alleged,' and (2) 'whether the right was clearly established' at the time of the violation." *Shaw v. District of Columbia*, No. 12-0538, 2013 WL 1943032, at *4 (D.D.C. May 13, 2013) (quoting *Saucier*, 533 U.S. at 201)).[6]

For the purpose of determining whether an officer who commits a constitutional violation is nonetheless entitled to immunity from suit, only a violation of "clearly established" constitutional rights—those that are apparent "in the light of pre-existing law"—thwart immunity protection. *See Atherton*, 567 F.3d at 689-90 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "An official enjoys protection from a lawsuit 'where [his or her] conduct is objectively reasonable in light of existing law'" despite its unconstitutionality. *Brown v. Fogle*, 819 F. Supp. 2d 23, 28-29 (D.D.C. 2011) (alterations in original) (quoting *Farmer v. Moristugu*, 163 F.3d 610, 613 (D.C. Cir. 1998)). "Conversely, an officer is not shielded where he could be expected to know that certain conduct would violate statutory or constitutional rights." *Id.* (internal quotation marks and citation omitted).

---

[6] In *Pearson*, the Supreme Court modified the *Saucier* analysis to give lower courts discretion to decide which of the prongs to address first. *Pearson*, 555 U.S. at 236; *accord Reichle*, 132 S. Ct. at 2093; *Rasul v. Myers*, 563 F.3d 527, 530 (D.C. Cir. 2009) ("[T]he *Saucier* sequence is [now] optional and [] lower federal courts have the discretion to decide only the more narrow 'clearly established' issue 'in light of the circumstances of the particular case at hand.'" (quoting *Pearson*, 555 U.S. at 236)).

In sum, to overcome the qualified immunity bar, the facts must establish that the official violated a right of the plaintiff's that is protected by the Constitution, and "existing precedent must have placed the statutory or constitutional question beyond debate[,]" *Al-Kidd*, 131 S. Ct. at 2083 (citation omitted), such that a reasonable official would have understood prior to acting that his conduct violates that right.

2. The First And Fourth Amendment Rights Not To Be Arrested For Protected Speech And Without Probable Cause

There is no dispute about the "clearly established" nature of the basic rights at issue here. The First Amendment right to free speech is a bedrock constitutional freedom. *See R.J. Reynolds Tobacco Co. v. U.S. FDA*, 845 F. Supp. 2d 266, 272 (D.D.C. 2012) ("A fundamental tenant of constitutional jurisprudence is that the First Amendment protects . . . the right to speak freely[.]" (internal quotation marks omitted) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). Having a constitutional right of free speech means that a person cannot be arrested and prosecuted in retaliation for engaging in protected speech. *See Hartman*, 547 U.S. at 256 ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out[.]" (citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998)); *City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987) ("The freedom of individuals verbally to oppose or challenge [] action without thereby risking arrest is one of the principle characteristics by which we distinguish a free nation from a police state."). It is also well established that the freedom to speak without being arrested on account of one's speech includes the right to use profanity. *Cohen v. California*, 403 U.S. 15, 18 (1971); *City of Houston*, 482 U.S. at 461 (noting that the First Amendment even protects profane

19

speech directed at police officers); *Williams v. District of Columbia*, 419 F.2d 638, 646 (D.C. Cir. 1969).

Moreover, it is clear beyond cavil that, in order to arrest someone in a manner that satisfies the Fourth Amendment, a police officer must have a warrant or probable cause to believe that the person has committed, or is engaged in committing, a crime. *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006) ("[T]o comport with the Fourth Amendment, a warrantless search or seizure must be predicated on particularized probable cause."); *Martin v. Malhoyt*, 830 F.2d 237, 262 (D.C. Cir. 1987) ("It is well settled that an arrest without probable cause violates the [F]ourth Amendment." (citation omitted)). A probable cause determination is objective and involves examining "the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause exists where the arresting officer possesses information 'sufficient to warrant a prudent [officer] in believing that the [suspect has] committed or [is] committing an offense.'" *United States v. Catlett*, 97 F.3d 565, 573 (D.C. Cir. 1996) (alterations in original) (citation omitted). The probable cause analysis is based on the "'totality of the circumstances,' which requires that 'the police had enough information to warrant a man of reasonable caution in the belief that a crime has been committed and that the person arrested has committed it.'" *Bolger v. District of Columbia*, 608 F. Supp. 2d 10, 18 (D.D.C. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983) and *Barham*, 434 F.3d at 572). The arresting officer's subjective state of mind is irrelevant to the inquiry, *Devenpeck*, 543 U.S. at 153; in other words, "[q]ualified immunity is appropriate 'even if [the officer] reasonably but mistakenly concluded that probable

cause existed.'" *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 19 (D.D.C. 2011) (quoting *Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C. Cir. 1993)).

In order prevent criminal punishment for speech in violation of the First Amendment, statutes that permit the arrest of speakers generally take care to include an additional element: the speech must implicate a substantial likelihood of violence, provocation, or disruption. *Cf. Gooding v. Wilson*, 405 U.S. 518, 525-27 (1972) (striking down Georgia's disorderly conduct statute, Ga. Code Ann. § 26-6303, as construed as Georgia state courts because the court did not require that the speech may cause a violent response); *Wiegand v. Seaver*, 504 F.2d 303, 306-07 (5th Cir. 1974) (striking down Florida's disorderly conduct statute, F.S. § 877.03, as interpreted by the Florida Supreme Court, in part because the court did not require that the speech cause any "actual disruption or disorder"); *see, e.g.*, *Diener v. Reed*, 77 F. App'x 601, 609 (3d Cir. 2003) (upholding Pennsylvania's disorderly conduct statute, 18 Pa. Cons. Stat. Ann. § 5503(a), as interpreted by the Pennsylvania Supreme Court because a punishable conduct "hinge[d]" on whether the speech "cause[s] or unjustifiably risk[s] a public disturbance"); *United States v. Jones*, 365 F.2d 675, 677-78 (2d Cir. 1966) (upholding New York State's disorderly conduct statute, N.Y. Penal L. § 722(2), as interpreted by the New York Court of Appeals because the court required "circumstances which would give the color of disorder and violence" to the conduct at issue). The disorderly conduct provision of the D.C. Code—Patterson's alleged criminal offense—is no different. In relevant part, the D.C. Code's disorderly conduct statute provides:

> (a) In any place open to the general public . . . it is unlawful for a person to:
>
> . . .
>
> (2) Incite or provoke violence where there is a likelihood that such violence will ensue; or
>
> (3) Direct abusive or offensive language or gestures at another person (other than a law enforcement officer while acting in his or her official capacity) in a manner likely to provoke immediate physical retaliation or violence by that person or another person.

D.C. Code § 22-1321(a); *see also id.* § 22-1321(b) ("It is unlawful for a person to engage in loud, threatening, or abusive language, or disruptive conduct, with the intent and effect of impeding or disrupting the orderly conduct of a lawful public gathering[.]").

As required to comply with the First Amendment, the D.C. Code's disorderly conduct provision clearly requires more than offensive speech—an individual's speech must threaten a breach of the peace in order to constitute a crime. *See Williams*, 419 F.2d at 646; *Martinez v. District of Columbia*, 987 A.2d 1199, 1203 (2010) (noting that a conviction for disorderly conduct under the D.C. Code based on profane speech "could survive a First Amendment attack only if it could be interpreted to include an additional element: that the language is spoken in circumstances which threaten a breach of the peace" (citation omitted)). Courts interpreting the D.C. Code have clarified that such a "breach of the peace" occurs only when the speaker's language (including the use of profanity) "creates a substantial risk of provoking violence," *Williams*, 419 F.2d at 646; *Dormu*, 795 F. Supp. 2d at 21 ("Circumstances in which a breach of the peace may be occasioned include where an individual's words are likely to produce violence on the part of others[.]" (citation omitted)); *see also Martinez*, 987

A.2d at 1202 (same).  In other words, the statute codifies the First Amendment's requirement that mere offensive or disturbing speech is not enough to warrant an arrest. *Chemalali v. District of Columbia*, 655 A.2d 1226, 1228 (D.C. 1995)

Indeed, as quoted above, the D.C. Code's disorderly conduct provision goes even further to protect speakers insofar as it makes clear that the offensive and provocative speech must be directed at someone *other* than a police officer in order to rise to the level of criminally punishable disorderly conduct.  *See* D.C. Code § 22-1321(a)(3) (exempting from punishment speech that is directed at "a law enforcement officer while acting in his or her official capacity").  This provision was added to the Code in 2011—the year before Patterson's arrest—purportedly to "minimiz[e] 'contempt of cop' arrests" and thereby reduce the widespread practice of police officers using the disorderly conduct law to arrest individuals indiscriminately and without a legitimate basis.  *See* Disorderly Conduct Arrest Project Subcommittee of the Council for Court Excellence, Revising the District of Columbia Disorderly Conduct Statute:  A Report & Proposed Legislation (Oct. 14, 2010), *attached to* D.C. Council Comm. On Pub. Safety & the Judiciary, Report on Bill 18-425, 70 (2010), *available at* http://dcclims1.dccouncil.us/images/00001/20110128161004.pdf [hereinafter "Council Report].  According to the report that accompanied the amendment, the D.C. Council wanted police officers to recognize that "the crime of using abusive or offensive language must focus on the likelihood of provoking a violent reaction *by persons other than a police officer* to whom the words were directed."  Council Report at 8 (emphasis added).  This tenet is also reflected in case law interpreting the statute.  *See Dormu*, 795 F. Supp. 2d at 21 ("[D]isorderly conduct does not occur merely because a crowd gathers

to watch a citizen-police encounter." (citation omitted)); *Shepherd v. District of Columbia*, 929 A.2d 417, 419 (D.C. 2007) ("[T]he focus ordinarily must be on the likelihood of a violent reaction by persons other than a police officer to whom the words were directed, because a police officer is expected to have a greater tolerance for verbal assaults and is especially trained to resist provocation by verbal abuse that might provoke or offend the ordinary citizen." (internal quotations marks, alterations, and citations omitted)).

Significantly, the First and Fourth Amendment are both implicated simultaneously in a situation in which a speaker is allegedly arrested in retaliation for speech alone in the absence of any likelihood of violence, provocation, or disruption. Such an arrest would clearly violate the First Amendment. *See City of Houston*, 482 U.S. at 461; *Cohen*, 403 U.S. at 15. And it would also constitute a Fourth Amendment violation insofar as the criminal statute upon which the arrest is based would likely require a risk of violence or provocation or disruption in order to comport with the First Amendment, and thus the arresting officer in the posited situation would not have probable cause to believe that the speaker was committing a crime. *See, e.g.*, *Dormu*, 795 F. Supp. 2d at 21; *Wesby v. District of Columbia*, 841 F. Supp. 2d 20, 34-35 (D.D.C. 2000).

### 3. No Reasonable Officer Could Have Believed That Patterson's Use Of Profanity Constituted Disorderly Conduct Under The Facts Alleged

Given the clearly established law that governs free speech and permissible arrests for disorderly conduct, and also taking the facts alleged in Patterson's complaint as true and drawing all inferences in Patterson's favor, *see Iqbal*, 556 U.S. at 663, 678, no reasonable officer could conclude that Patterson's conduct was likely to produce

violence or otherwise cause a breach of the peace, as required to justify either punishing his speech under the First Amendment or arresting him for disorderly conduct. *See Dormu*, 795 F. Supp. 2d at 21.

There is a significant body of jurisprudence that addresses the confluence of these First and Fourth Amendment violations in the context of arrests for disorderly conduct under the D.C. Code, and these cases outline the parameters of permissible police action in circumstances that are similar to those at issue here. For example, in *Chemalali*, a police officer arrested an individual who had been walking behind a group of people hitting and kicking them, and when the officer warned him to stop, the man began yelling and cursing at the officer and a nearby citizen. 655 A.2d at 1227. Once a crowd had gathered, the individual began comparing the situation to the Los Angeles riots and enticing the crowd to join in to protest the officers' actions. *Id.* The D.C. Court of Appeals found that the police had probable cause to arrest the individual for disorderly conduct because his words and actions were likely to produce violence on the part of others. *Id.* at 1228-29. Other courts have reached the same conclusion under similar circumstances. *See, e.g.*, *Gilles v. Davis*, 427 F.3d 197, 206 & n.6 (3rd Cir. 2005) (finding that a reasonable officer could have found probable cause to arrest an individual for disorderly conduct where the individual's "rude, mocking, confrontational, and insulting" speech directed toward members of a crowd that had gathered resulted in "genuine hostility" in that crowd, including one person who threw an apple at the individual); *Smith v. McCluskey*, 126 F. App'x 89, 94 (4th Cir. 2005) (finding that a reasonable officer could have found probable cause to arrest an individual for disorderly conduct where a crowd gathered after the individual had been

arrested, and he screamed at the crowd that he was being "treated like Rodney King," which was intended to incite concerns of police brutality and provoke the crowd).

By contrast, in *Shepherd*, a police officer issued a ticket to the defendant for not paying to enter the D.C. Metro, and the defendant began yelling and cursing at the officer. 929 A.2d at 418. After drawing a crowd, the defendant continued to yell and curse at the officer, who arrested the defendant for disorderly conduct. *Id.* The defendant was later convicted. *Id.* The D.C. Court of Appeals overturned the conviction, finding insufficient evidence to show that the defendant's actions were calculated to lead to a breach of the peace. *Id.* at 419-20. The court held that there was no probable cause for the defendant's arrest in the first instance, because the "bare possibility" of provoking violence from others based on profanity directed towards a police officer does not constitute disorderly conduct. *Id.* at 419. Rather, disorderly conduct occurs when an individuals' actions directed towards a crowd create a "likelihood or probability" of a violent response from the crowd. *Id.*

In this case, according to the complaint (which must be regarded as stating true facts at this point in the litigation), Patterson cursed quietly while looking up at the sky in an almost empty park. (Compl. ¶ 9.) The complaint alleges that the Tea Party supporters did not react to Patterson's statements at all, and certainly not in any way that would cause a reasonable officer to conclude that there was any real threat of a violent reaction. (*See id.* ¶¶ 9-10.) As the complaint relays the events, this first instance of profanity is the only one that could possibly be construed as directed towards the crowd; all subsequent profanity was directed solely towards the officers (*see id.* ¶¶ 11-14), and, as such, cannot serve as the basis for probable cause in this

context.  *See Shepherd*, 929 A.2d at 418; *see also* Council Report at 8 ("[T]he crime of using abusive or offensive language must focus on the likelihood of provoking a violent reaction by persons other than a police officer to whom the words were directed[.]"). But even considering the later instances of profanity that Patterson uttered once the Tea Party supporters had noticed him, cursing at an officer in the presence of a crowd, without some indication of a likely violent reaction from that crowd, does not give rise to probable cause to believe that the speaker is engaged in disorderly conduct.  *Cf. Shepherd*, 929 A.2d at 418; *Dormu*, 795 F. Supp. 2d at 21.

Sergeant Reid's alleged subsequent comment that Patterson had created a "hostile environment" for the police, which is quoted in the complaint (Compl. ¶ 17), does not help Defendants as far as their claims of qualified immunity are concerned. Sergeant Reid's comment is clearly a statement of opinion, rather than fact, and the complaint's factual recitation belies Sergeant Reid's stated opinion in this regard. There are no facts alleged in the complaint that indicate that the Tea Party supporters had any reaction to Patterson's profanity or his back-and-forth with Sergeant Reid, let alone a reaction that manifested an imminent breach of the peace.  Patterson does not allege that his profanity was directed towards the Tea Party supporters, nor that they were in any way provoked to violence; indeed, the alleged incident is, at most, best characterized as the same type of "contempt of cop" expression that the disorderly conduct statute was carefully crafted to permit in light of the First Amendment.

In short, because no reasonable officer could conclude that there was probable cause to believe that Patterson was committing disorderly conduct on the facts as alleged in the complaint, the complaint ably supports the claim that Patterson was

arrested in retaliation for his protected speech and that the individual officers therefore violated Patterson's clearly established First and Fourth Amendment rights.[7] Consequently, the individual defendants have not satisfied *Saucier*'s qualified immunity test.

Undaunted, the individual defendants strenuously dispute the "clearly established" nature of Mr. Patterson's alleged First Amendment right to be free from retaliatory arrest under the circumstances presented in the complaint. (*See* Defs.' Mot. at 5.) But this argument plainly puts the cart before the horse because the constitutional right that Defendants deem unclear and unestablished is the right to be free from a retaliatory arrest that is *otherwise supported by probable cause*. (*Id.* at 4-5.) Plaintiffs make no such allegation here, and Defendants do not address whether the right to be free of retaliatory arrest in the *absence* of probable cause is clearly established. Moreover, as explained above, it is clear from the D.C. Circuit's *Dellums* opinion that the right to be free from a retaliatory arrest in the absence of probable cause is clearly established in this jurisdiction. In other words, in the D.C. Circuit, a police officer is unquestionably on notice that arresting a speaker solely based on the content of his speech and without probable cause to believe that he has committed a crime is a violation of the First Amendment. *See Dellums*, 566 F.2d at 194-95.

---

[7] Although the complaint does not use the term "retaliation," it specifically alleges that Patterson was arrested "solely on account of the content of his speech" and that Sergeant Reid not only lacked probable cause to arrest Patterson but also that Sergeant Reid "would not have arrested Mr. Patterson but for Mr. Patterson's engaging in protected conduct." (Compl. ¶ 22.) This is sufficient to establish a claim for retaliatory arrest on the basis of protected speech in violation of the First and Fourth Amendments. *See Reichle*, 132 S. Ct. at 2096 (noting that to state a claim for retaliatory arrest, the plaintiff must establish a causal connection between an officer's animus and the injurious arrest); *cf. Bergdoll v. City of York*, 515 F. App'x 165, 170 (3d Cir. 2013) (finding that, on summary judgment, a plaintiff's First Amendment retaliatory arrest claim fails where "she cannot show that her speech was the but-for cause of her arrest").

Accordingly, Defendants' argument that the First Amendment claim here must be dismissed on qualified immunity grounds, because the relevant right is not "clearly established" or otherwise, cannot be accepted. The complaint alleges that Patterson was arrested solely on the basis of his speech (Compl. ¶¶ 22, 23) and that there was no probable cause for his arrest for disorderly conduct because his comments "did not cause or threaten to cause either a breach of the peace" or "violence on the part of others." (Compl. ¶¶ 18, 22-23). In addition, this Court has examined the complaint's factual allegations and has concluded that no reasonable officer could have found probable cause for Patterson's arrest on the facts alleged, which at this point in the litigation must be accepted as true. This is enough for Counts I and II to withstand Defendants' motion to dismiss.

## IV.  CONCLUSION

For the foregoing reasons, Patterson's complaint states a plausible claim for relief based on the individual officers' alleged violations of the First and Fourth Amendment, and the officers are not entitled to qualified immunity as to either Count I or Count II. Consequently, the individual defendants' motion to dismiss is **DENIED**. Pursuant to Federal Rule of Civil Procedure 12(a)(4), the individual defendants shall file a responsive pleading by January 20, 2014.

DATE:  December 19, 2013

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge